**STATE ex HUSSEY v HEMMERT**

Ohio Appeals, 2nd Dist, Shelby Co

No 121. Decided April 30, 1941

M. E. Hussey, Sidney, for relator.
W. A. Trimpe, Sidney, and H. A. Beery, Sidney, for respondent

## OPINION

By GEIGER, PJ.

The matter now before the Court is unusual and novel to us. It arises out of a motion filed to vacate a former judgment of this Court and for leave to intervene.

One Herbert Wical, whom we shall designate "intervenor", moves this Court to vacate a judgment entered in the cause on the 8th day of January, 1941, on the ground that the "said judgment was procured by fraud, collusion and misrepresentation" and further that he as a taxpayer be granted leave to intervene in said cause and answer. In support of his motion he states that he is a taxpayer of the incorporated village of Botkins located in the county of Shelby, state of Ohio; that Millard E. Hussey is the solicitor of said village; that as a taxpayer he delivered to said solicitor a request in writing to institute appropriate legal proceedings to enjoin the village from proceeding with the issuance and sale of $14,000.00 of general obligation water works bonds. He sets out a copy of the request made by him as a taxpayer to the solicitor. He further requests that the solicitor enjoin the village from proceeding to construct the water works system. This notice was dated December 26, 1940. Upon request of the city solicitor he later set out in detail his reasons for said request and filed the same with the solicitor under date of December 31, 1940. The reasons so given to the solicitor may be briefly stated as follows:

(1) That the petition which was signed by the subscribers prior to an election of 1938 was circulated and signed on the representation that the water works system was to be constructed with federal aid and that the government was to furnish 45% of the money to be used for such construc-

tion; that a statement to this effect was circulated among the citizens by council, to persuade them to vote in favor of the issuance of the $14,000.00 general obligation bonds.

(2) That the resolution of the council adopted the 30th day of August, 1930, stipulates that the construction include certain equipment, which, under the present plan, is to be omitted.

(3) That under such resolution it was stipulated that the counsel desires to hold a special election under the provisions of House Bill No. 544 as enacted by the 91st General Assembly, but that said system is not being constructed under said act.

(4) That the council never legally voted in favor of mortgage revenue bonds.

(5) That the $14,000.00 general obligation bonds were voted by the electors in accordance with the resolution providing for an election, which resolution provided that 45% of the costs would be paid by the federal government; that House Bill No. 544 provides that bonds should not be issued until a contract was entered into with the federal government in which the government obligated itself to pay 45% of the costs of construction; that said contract was never entered into by the government; that this provision of the statute has at no time been complied with.

(6) That the contract entered into with C. L. Snyder & Company provides that a portion of the proceeds of the sale of the bonds is not to be used for the construction of the water works but for other purposes.

No. 7 is a repetition of the former statements.

Intervenor further says that on the 7th day of January, 1941, before the solicitor had refused his request and while said request was pending, Millard E. Hussey, as solicitor, filed with the Court of Appeals an action entitled State of Ohio ex rel Hussey, Solicitor, Relator v C. J. Hemmert, Clerk, Respondent, alleging that the same was filed on request of a taxpayer; that Hemmert as clerk of the village refused to sign certain notes in the amount of $14,000.00 described in the petition as to be issued in anticipation of the issuance of $14,000.00 of general obligation bonds and that because of said refusal said notes could not be issued; that all acts, conditions and things requisite to establish the legality of the bonds existed or had been done as required by law; that the bonds were legal and prayed therein that the Court issue its writ commanding Hemmert, as cierk, to sign said anticipatory notes and deliver the same upon payment of the purchase price.

Intervenor further states that contemporaneously with the filing of the petition, said solicitor filed a waiver of summons signed by the respondent as clerk and a general demurrer stating that the petition does not state facts showing a cause of action, said demurrer being signed by Thomas L. Miller as attorney for said Hemmert, respondent.

Intervenor further states that on the 8th of January, 1941, the demurrer came on for hearing in this Court and was overruled, it being then represented to the Court that the respondent did not desire to plead further. This Court entered a final judgment for the relator and against respondent granting the prayer of the petition, that a peremptory writ issue commanding the respondent, Hemmert, to sign said note and deliver the same upon payment.

A copy of the journal entry of said date filed in this Court is exhibited in which the demurrer is overruled and final judgment given for relator. The entry further recites that the Court finds in favor of the relator upon the issues and that said election on the question of the issuance of the bonds is valid and that the anticipatory notes are a valid and legal obligation of the village. The Court decreed that the village has the legal right to issue said notes and that a peremptory writ of mandamus issue commanding the respondent to sign said notes and deliver the same upon the payment of the pur-

chase price and that the respondent waives all right of appeal.

The intervenor further alleges that there exists a valid defense to the cause of action as detailed in his request to the solicitor, above alluded to.

Intervenor further alleges that said House Bill No. 544 is the sole statutory authority for all proceedings taken by council in connection with the proposed issuance of the general obligation bonds, including the calling and holding of the special election on the 30th day of September, 1938, at which said bonds were voted and that all said proceedings were taken and election held under said statute.

Intervenor further says that said cause (referring to the action in this Court) was brought in collusion with respondent, Hemmert, and his attorney Miller.

Intervenor says that Miller, who signed the demurrer of the respondent Hemmert as his attorney, was also the attorney for Granberry & Company, which company was under contract to purchase the notes.

Intervenor further says that notwithstanding the petition praying for a writ of mandamus, said Hemmert had in fact actually signed said notes and delivered the same to Granberry & Company, the purchasers thereof, on a day prior to January 7, 1941, and had received the proceeds of the sale of said notes and had deposited the same to the credit of the water works funds of the village and that, therefore, the allegations of the petition in respect to the refusal of Hemmert to sign were false and misrepresented material facts alleged in the petition upon which demurrer was overruled and the petition sustained and the relief granted.

Papers filed in the case in the Court of Appeals, Shelby County, entitled State of Ohio ex rel Hussey v Hemmert, support the allegations of the motion in reference to the procedure followed in the case.

A brief was filed by Hemmert on March 24, which is stated to be "with reference to the motion filed by an alleged taxpayer to vacate the judgment heretofore rendered in this case and for leave to intervene". The first seven pages of this brief are devoted to the contention that the intervenor herein has no right to file the motion asking that the judgment be set aside or that he be permitted to intervene and further that he has been guilty of laches. It is asserted that if he has a right to intervene it must be by virtue of §4314 GC providing for a suit by a taxpayer in case a solicitor fails upon request to make any application as requested by the taxpayer.

We are frank to say that we are not concerned with the right of this intervenor as a taxpayer. It is not a matter of concern with us how this transaction is brought to the attention of this Court. Our concern is whether or not the allegations of the petition of Hussey, acting as solicitor of the village, against Hemmert, the village clerk, falsely presented the facts alleged or omitted pertinent information which should have been exhibited to the Court and thereby the Court was induced to render the judgment as exhibited by the entry of January 8, 1941, through which the citizens of the village and those interested in the issuance of the bonds were prejudicially affected.

The Court will not debate the question as to the right of the intervenor to bring these matters to the attention of the Court as the Court has a right to consider the matter irrespective of the source of our information. We are more interested in the power of the Court to vacate or modify its orders during or after the term at which they were rendered.

The judgment complained of was entered on January 8, 1941, being in the October 15, 1940 term of the Court. The motion to vacate the judgment was made on March 5, 1941, in the same term that the judgment itself was rendered, that term ending March 11, 1941. If there be any question touching the right of the Court to vacate or modify its orders made within the term in which they were entered as against the right of the Court to vacate its judgment after the term in which the judg-

ment was rendered, §11631 GC provides that the Court may modify its orders after term in the manner and for the reasons enumerated in said section, which include the right to vacate after the term: "4. For fraud practiced by the successful party in obtaining a judgment or order."

We do not concede that our right to modify the judgment should be limited to the showing that the ▉▉▉▉▉▉ ▉ same "was procured by fraud, collusion and misrepresentation", as alleged in the motion of the proponent. It is sufficient if there be a showing that the rights of the interested parties be prejudicially affected by the order of the Court, if there was inadvertently or purposely a withholding from the Court of matters which should have been properly before it, and but for which withholding the judgment would not have been rendered.

To correctly appreciate the facts, we may further examine the brief filed by respondent and also examine the depositions of one Hemmert, the clerk, Taubkin, the mayor, and Hussey, the solicitor, taken on March 19, 1941, together with the exhibits attached to such depositions.

It is asserted by the respondent on page 7, et seq. of his brief that in the present case, after the rendition of the judgment sought to be set aside and prior to the filing of the motion, the village issued and sold the anticipatory notes and therefore obligated itself to pay for the same; that since their issuance these notes have been sold and resold and now are in the hands of innocent third parties whose rights have intervened prior to the filing of the motion, which rights can not now be violated even if the judgment of the court is vacated. It is asserted that under the circumstances of this case, there has been no showing that the refusal to vacate the judgment would prejudice the rights of either the village or the taxpayers and it is further claimed that the fact that the judgment may have been erroneous where the Court has jurisdiction, is not suf-

ficient for its vacation unless there are grounds proven which will justify the Court to vacate the judgment and it is claimed that there is nothing in the record to show any fraud practiced by the successful party.

It is pointed out that while in holding the election for the issuance of bonds, advantage was taken of the federal aid statute, that this statute allows certain exceptions, among them the authority of a municipality to issue bonds beyond the indebtedness prescribed by the Uniform Bond Act, but that in the present case the Uniform Bond Act was followed in every particular except with reference to the holding of the election which is only a technicality; that the village would not have needed to take advantage of the federal aid statute if it had not desired to submit the question at a special election at which time it followed the provisions of the federal aid statute in that it had conditional approval of the federal authorities. It is asserted that the election was valid in all respects and the ballots do not refer to the federal aid and that the only question voted upon was the issuance of bonds and the levy of any necessary tax to pay the same and as a consequence more than 65% of the electors were and are in favor of the construction of the system and for the issuance of the $14,000.00 to pay in part for the same. It is claimed that it would be a very technical decision and one that would injure rather than benefit the interests of the taxpayers to hold that an election perfectly valid and the unmistakable choice of the electors should be set aside because the village proceeded to issue bonds under the Uniform Bond Act within the debt limitation rather than to suffer the delay until it could get action from the federal government. It is urged that since the order of the Court, the writ has been issued and has been obeyed and the notes sold and that it would be of no avail to the taxpayer to vacate the judgment. The village is legally liable irrespective of any claimed illegality of the issue and there is no claim that

the bonds are not legal on their face. It is urged that the judgment ought to be allowed to stand so that the wishes of the electors, as expressed at the polls, may be carried out and it is submitted that the sustaining of the motion to vacate would injure rather than benefit the interests of the taxpayers and that since no showing has been made that anyone will be injured, the motion should be overruled.

It will readily be detected than much of the relator's argument is fallacious. If the bonds were authorized, and voted upon, on the theory that the government was to pay a large part of the expenses. then the shift to an improvement in which the government did not participate and in **Headnote 2.** which the provisions of §544 were abandoned and the bonds sold without any guaranty of the government as that section provided, we can not rightly say that the electors in no way suffered because the improvement can be made with no loss to the taxpayer under the method now sought to be pursued.

It will be noted that the council of the village also voted upon the issue of bonds and the members who voted for that issue did so with the understanding that government aid was to be secured. We, therefore, have two groups of citizens each of which was entitled to rely upon the initial plan for the issue of the bonds, to-wit, the members of the city council who voted for the ordinance and the electors who voted for the bond issue. The rights of each have been violated by the plan seeking to abandon the initial scheme and the adopting of a different plan. It seems to us that if the village authorities concluded that the plan of having the government contribute would ultimately be an expensive venture for the village, the proper way to have handled the matter was to have a new election, if necessary, or, if not necessary, that the bonds be authorized strictly under the general bonding section and not under the restricted provisions of §544.

The relator's argument is simply to the effect that if after the citizens expressed their intention not only through the members of the council but through their own vote, to undertake the building of a water works system under a special enactment, certain of the city authorities took the position that the citizens would be just as well or better off if they abandon their first plan and accept a different one, the citizens could not properly complain. As to the argument that the issue of the bonds was valid under the general bonding act, as it did not exceed the debt limitation provided by the general statute and permitted by §544, the answer is that was not the method pursued for the bond issue and was not the basis of authority. The objection asserted by the intervenor is more than a technicality. It is substantial.

Without further discussion of this matter, we proceed to an examination of such of the evidence shown by the depositions as may be pertinent. The first witness was C. J. Hemmert, the clerk, examined as an adverse party upon cross-examination. It was developed that he was the village clerk whose duty it was to sign the bonds; that he had been advised by the relator not to do so until an order of the court be secured; that he had full knowledge of the purpose of such an order and further that he knew that he was collaborating with Thomas Miller, who filed his demurrer and that Thomas Miller, as a matter of fact, occupied the dual relation as attorney for Granberry & Company and for the clerk of the village. Under Village Ordinance 299 it was ordained that Thomas Miller and Millard E. Hussey be employed as special counsel for the purpose of supervising the proceedings of the village for the proposed water works mortgage revenue bonds and the proposed general water works bonds in the sum of $40,000.00 and $14,000.00 respectively. By Section 2 it was ordained that their compensation shall be $1,000 paid **from the proceeds of the bond issue.**

Mr. Hemmert, the clerk, certainly knew that he was really not an adverse party but was one necessary on account of his official position and that he was expected to do as he was told by the relator, Hussey, as solicitor. He also knew that the notes should ultimately go to Granberry & Company. He testifies that all he knew about the suit was that he signed a waiver of summons and that he understood that Mr. Hussey and Mr. Miller would handle the suit. He testifies as to resolution No. 277, passed August 23, 1938. It discloses that the council met in special session and adopted a resolution to the effect that the council of the village desires to issue bonds in the sum of $14,000.00 for a water works system and whereas the council desires to hold a special election for this purpose under the provisions of House Bill 544, it is resolved that the council request the Tax Commission to hold a special election on the 30th day of September, 1938. He also testifies that no contract was ever entered into by the federal officers with the officers of the village; that after he had received word from Hussey that the entry had been signed by the Court, he signed the notes as clerk on Hussey's instructions. Hussey had advised him not to sign and did not give any reason. He admitted that he had seen, before the election, the circular that was issued to the electors, and stated that after the circulars had been issued, the plans were all changed. He states that the water works plant is now under construction at Botkins and that payments have been made to the contractor for his work out of the water works fund which was derived from the sale of general obligation and revenue bonds.

Mr. W. J. Taubkin, Mayor of the village, testified under direct examination. His testimony was substantially the same as that of the clerk with some minor additions to the effect that he authorized the mimeograph of the circular issued prior to the election. All he knew about the suit was that he was handed a waiver of summons which he signed.

Millard E. Hussey, the relator and city solicitor, was examined as on cross-examination. He testified that he had delivered waivers of summons upon the suit to the clerk and to the mayor on January 4, 1941; that upon delivering to Hemmert the waiver he explained the meaning of mandamus, in that he was trying to get an order from the Court compelling the clerk to sign the $14,000.00 of general obligation anticipatory notes. He stated that upon the occasion of his signing the waiver he told the clerk that his information was that the Wical matter, wherein he had been requested to bring an action, was going to be dropped. He had told Thomas Miller, the Columbus attorney, of the filing of the request by Wical to institute proceedings; that prior to the service of summons, he had advised Hemmert not to sign the notes in anticipation of the issuance of the $14,-000.00 of general obligation bonds. He states that he brought the action at the request of a taxpayer by the name of Dr. McVay made on or about December 26, 1940; that he kept this request under advisement until the 4th of January, 1941. The petition and the demurrer were filed simultaneously on the 7th of January, 1941. He discussed with Mr. Miller the situation created by the filing of the notice by Wical requesting him to enjoin the $14,000.00 worth of obligation bonds. Upon being asked whether when he advised Hemmert not to sign the notes he gave any reason, his answer was:

"The matter of playing safe. I didn't want any question to be raised as to the legality of the notes and that was the method. I did not want him to sign those notes and put his foot in it."

He was "skeptical" concerning the notes. The purpose of bringing the suit was to determine the legality by judicial interpretation of the notes and of the general obligation bonds. Upon being asked, why he was skeptical as to that, he stated, "There were

many reasons; I can't enumerate them." He testifies as to applications to the government for loans which were turned down.

One of the exhibits is a mimeographed circular with a box form marked with an X "for the bond issue". and signed by Taubkin, Mayor. It solicits the vote for the water works project at the election September 30, 1938, and states, in substance, among other things, that the total cost of the system will be $57,000.00, including water softening system. This will be financed in three ways. The federal government will give the village of Botkins a grant of $26,000.00. This amount is nearly half the cost of the project and is an outright gift never to be repaid. In addition to this the government will loan $17,000.00, taking a mortgage loan on the water plant for this amount. This $17,000.00 will be paid back to the government from the profits derived from the system. The additional $14,000.00 will be derived from bonds to be repaid by taxation over a period of twenty-eight years.

The circular states that the federal government would furnish $26,000.00 as a gift to the village of Botkins and in addition loan $17,000.00 to be paid back over a period of twenty-eight years. We have no way to determine whether this is a correct statement of the government's prodigality with taxpayers' money, but assume that it is. It certainly acted as a lure to persuade the thrifty taxpayer of Botkins, who seemed to be getting something for nothing, to cast his vote in favor of the project. Having been so persuaded by the officials of the village and having voted as urged, he should not be disappointed by being informed that the government's contribution has been abandoned and the burden placed upon the local taxpayer.

A very interesting statement made by Mr. Hussey, the relator, in relation to his instruction to the clerk not to sign the notes was that he did not want him to sign the notes and put his foot in it. **He was skeptical concerning the notes** and that purpose for bringing the suit was to determine the legality of the notes by judicial interpretation of the notes and that there were many reasons why he was skeptical as to the legality of the notes and the general obligation bonds.

Without further dealing with this testimony, we can safely arrive at the general conclusion that the village council in voting for the issue of the bonds did so under the supposition that the federal government would supply a considerable portion of the cost and that this alluring bait was placed before the electors through a circular endorsed by the mayor; that at a later date the city solicitor and lawyer Miller of Columbus were engaged for a fee of $1,000.00 to supervise the issue of the bonds; that the city solicitor was "skeptical" as to the validity of the bonds and instructed the clerk not to sign them and that thereupon he prepared the petition together with an entry and presented the same to the several Judges of this Court, who severally signed the entry without being in any way advised that there were matters that might raise serious questions as to the validity of the bonds. The matter was presented to the several Judges as an informal finding clearing up the title to the bonds so as to permit them to be sold and the work to progress, which proceeding is not unusual. This was an imposition upon the Court and a withholding of matters that might properly stay the action of the Court until further investigations were made. The Court was not informed that Mr. Wical had given notice to the city solicitor to bring an action testing the validity of the bonds, nor was the Court informed that the general plan for the issue of the bonds was altered and no longer in conformity with the vote of the electors.

What can the Court do about the matter at this time? It is a general rule that Courts of general jurisdiction are endowed with inherent powers controlling their own judgment and of correcting, modifying or vacating the same during the term at which

they were rendered. Courts of Appeals may vacate or modify their own judgment during the term at which they were made or after term for good cause. The statutory power er of a Court to vacate or set aside its judgment after the judgment term is in addition to the Court's inherent powers, exercised under certain conditions. In speaking of §11631 GC relating to the power of the Court to vacate or modify its orders after term, Judge Allen in the case of **Power & Light Company v Smith, 126 Oh St 601,** says on **page 611:**

"We deem it unnecessary to consider the various technical questions raised with reference to §11631, for under the general equity power of the Court, the statutory remedy in this state is not exclusive but cumulative. The Court had power under its general equity jurisdiction to set aside this judgment entered through fraud, irrespective of and unlimited by the provisions of §11631." Citing cases.

In the case of **Christman v Coleman, 117 Oh St 1,** Robinson, J., speaking for the Court quotes, on page 8, Pomeroy Equity Jurisprudence, to the effect that when a judgment or decree of any court has been obtained by fraud, the fraud is regarded as perpetrated upon the court as well as upon the injured party. The judgment is a mere nullity and may be attacked and defeated on account of fraud in any collateral proceeding brought upon it or to enforce it at least in the same court in which it was rendered.

Touching the question as to whether this Court may vacate the judgment at this time after the expiration of the term at which it is made, see

**Knox County Bank v Doty, 9 Oh St 506;**

**Niles v Parke, 49 Oh St 370, 3d Syl.;**

**Chandler v Southern Pacific, 104 Oh St 188.** Bottom of page 193 and top of page 194.

**Tuck y Chapple, 114 Oh St 155.**

We feel that there was an imposition upon the Court and that the Court can not, with self respect, remain passive.

We are not concerned with what may happen as a result of vacating the judgment and it may be that the intervenor has not the right to intervene as representing taxpayers.

The Court is of the view that the facts which have been developed justify the Court in setting aside the judgment which was rendered without the information to which the Court was entitled.

The judgment of January 8 will be vacated.

We will not now pass upon the right of Wical to intervene, but will take that up if future developments make it necessary.

Judgment accordingly.

HORNBECK, J., concurs.
BARNES, J., concurs in judgment.

## APPLICATION FOR REHEARING

No 121. Decided May 23, 1941

BY THE COURT:

This matter is before us upon an application made by Millard E. Hussey, Relator, for a rehearing of this cause to the end that the decision of this Court be set aside for reasons not heretofore presented but apparent from the record.

The first reason given is that the deposition filed in the Court did not contain the agreed stipulation that after the first notice upon the solicitor had been withdrawn a second notice was filed with the solicitor and refused, and the notices were requests upon the solicitor to bring suit on behalf of Wical filed with the relator, the second of which was filed with the relator after the judgment of this court had been rendered.

It is a little difficult to understand just what matter is now being presented by this statement, but we assume that complaint is made that the depo-

sition did not contain certain stipulations in relation to giving of notice by Wical to the city solicitor demanding that he bring the action.

The attorney now presenting this as an objection had an opportunity to examine the deposition before it was finally transmitted to the Court and his motion today should not be a ground for rehearing, especially as, in our judgment, it would have made no difference whether the omitted matter had been set out in the deposition or not, as we do not regard it as essential in the determination of the case.

· The second ground is that the Court improperly admitted an affidavit in evidence without giving the relator the privilege of cross-examination or counter affidavit. This ground is not available for the reason that it does not say what relator expects to show if permitted to open the case and gain a rehearing. As we understand the matter contained in the second reason, it would be of no consequence in the final determination of the case.

The application for rehearing is denied.

GEIGER, PJ., BARNES, J., and HORN-BECK, J., concur.